UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| In re: | : | |
| BRUCE E. THUNBERG<br>Debtor | : | BK No. 00-12818<br>Chapter 7 |
| | : | |
| MARC D. WALLICK, Trustee<br>Plaintiff | : | |
| v. | : | A.P. No. 02-1046 |
| WAKEFIELD MILL BUILDING, INC.<br>Defendant | : | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER APPOINTING INDEPENDENT AUDITOR**

APPEARANCES:

Stephen R. Famiglietti, Esq.
Attorney for Debtor
FAMIGLIETTI & CARLIN, LTD.
132 Old River Road, Suite 205
Lincoln, Rhode Island 02865

Robert D. Goldberg, Esq.
Attorney for Plaintiff/Trustee
GOLDBERG LAW OFFICES
226 Cottage Street
P.O. Box 557
Pawtucket, Rhode Island 02862-0557

Charles S. Beal, Esq.
Attorney for Defendant
CAMERON & MITTLEMAN LLP.
56 Exchange Terrace
Providence, Rhode Island 02903

BEFORE ARTHUR N. VOTOLATO, United States Bankruptcy Judge

BK No. 00-12818; A.P. No. 02-1046

Heard on the Trustee's Complaint against Wakefield Mill Building, Inc. ("WMB"), claiming: (1) that the Debtor (Thunberg), an alleged 49% partner, is entitled to a share of the assets and profits of the Wakefield Mills Properties partnership ("WMP"); and (2) that Thunberg is owed $75,000 for finding a buyer for certain partnership real estate. Combined with the Adversary Proceeding, we also heard Thunberg's objection to WMB's proof of claim in the amount of $417,782 for pre-petition loans made to him. After a lengthy hearing, the submission of proposed findings and conclusions, and based upon the testimony, the exhibits, and the applicable law, I (1) submit the following findings of fact and conclusions of law, in accordance with Fed. R. Bankr. P. 7052, and (2) Order the appointment of an independent auditor. *See* 11 U.S.C. § 105.

## <u>BACKGROUND AND FACTS</u>

**The Partnership Agreement**

1. On June 13, 1991, pursuant to the Uniform Partnership Act, R.I. Gen. Laws § 7-12-17 (1956), (Ex. 2 ¶ 5), WMB and Bruce Thunberg entered into a partnership agreement ("Agreement"), making Thunberg a 49% partner and WMB a 51% partner. (Ex. 2 ¶ 5.)

Other provisions of the Agreement relevant to this dispute, are:

2. If Thunberg made capital contributions of $150,000 within eighteen months from the date of the Agreement, his partnership interest would increase from 49% to 50%, and WMB would be required to match Thunberg's contribution and to infuse an additional $250,000 of capital. (Ex. 2 ¶ 5.)
3. If Thunberg failed to timely contribute $150,000, his right to become a 50% percent partner would expire. (Ex. 2 ¶ 5.)
4. If Thunberg failed to make capital contributions totaling $50,000 within six months, his partnership interest would be adjusted proportionally to the amount of his contribution. For example, $75,000 would give Thunberg a 25% interest, and contributions of $150,000 would entitle him to a 50% share. (Ex. 2 ¶ 5.)
5. If Thunberg failed to make capital contributions in the aggregate amount of $25,000 within eighteen months, his partnership interest would be reduced to 0%. (Ex. 2 ¶ 5.)
6. Under Paragraph 13 of the Agreement, either party could unilaterally terminate the partnership, and Paragraph 14 contains the procedure for the liquidation of partnership assets. (Ex. 2 ¶¶ 13-14.)

7. The evidence clearly shows, as illustrated below, that the Agreement is at least as notable for its amendments, modifications, and waivers, as for its original content, i.e.:

a. On June 30, 1992, the parties entered into the "First Amendment to Partnership Agreement" which extended Thunberg's time to make his "minimum capital contribution payment to the Partnership as set forth in Paragraph 5 of the Agreement" until December 13, 1993. (Ex. 68.)

b. On December 10, 1993, the parties entered into a "Third Amendment to Partnership Agreement" ("Third Amendment"), providing that, "the time in which Bruce E. Thunberg should make his minimum capital contribution payment to the Partnership as set forth in Paragraph 5 of the agreement is extended up to and including December 15, 1994." (Ex. 5.)

c. On June 6, 1995, Thunberg and WMB executed the "Fourth Amendment to Partnership Agreement" ("Fourth Amendment"), wherein Thunberg's time to "make his minimum capital contribution payment to the Partnership as set forth in Paragraph 5 of the Agreement is extended up to and including May 31, 1996." (Ex. 6.) The Fourth Amendment also required Thunberg to execute a promissory note and

to bring his loan account current before he could exercise his capital contribution options. (Ex. 6.)

d. The Fourth Amendment also established that Thunberg owed the Partnership $253,776.03 as of June 6, 1995. (Ex. 6 ¶ 1.)

**Capital Contributions**

8. I find that Thunberg failed to meet the $150,000 capital contribution requirement, and that there were no extensions or waivers of that requirement.

9. Thunberg did, however, make a number of payments to the Partnership which totaled approximately $124,000 (Debtor's Mem. at 7), *some* of which I find to be capital contributions, and *some* of which are loan payments:

a. On Schedule K-1 of WMP's 1991 tax return (Ex. N), WMP's capital account reflects a balance of $7,367, and according to WMP's accountant, Steve Lima, this entire amount was credited solely to WMB. Because of Thunberg's 49% ownership of that account at that time (*See* Ex. 6 ¶ 3), $3,610 is found to be and should have been treated as a capital contribution.

b. On June 1, 1992, Thunberg paid the $7,500 earnest money deposit required for WMP to purchase the Farmer Brown

property. At the closing, WMP credited itself for the entire $7,500 against the purchase price. (Ex. 61.) Thunberg is entitled to a capital contribution of $7,500.

c. Thunberg held a mortgage on real estate in Vermont, which he assigned to WMP. In 1999 when the property was sold, WMP was paid $34,399.74, (Ex. XXX). This is also a capital contribution.

d. In February, March and April 1993, Thunberg and his former wife deposited three checks totaling $30,000 in WMP's Rhode Island Hospital Trust account. (Ex. 14, 15.) These are loan payments.

e. A Mutual of Omaha Insurance Policy payment to Thunberg in the amount of $16,130.90 was deposited in WMP's Rhode Island Hospital Trust account on May 26, 1993. (Ex. 14, 15.) This is a capital contribution.

f. Checks from Thunberg to WMP totaling $22,951 were deposited in WMP's accounts at various times during 1993. (Ex. 14, 15.) They represent loan payments.

g. Saugatucket Associates, Inc., a corporation owned by Thunberg, paid $10,000 to WMP, and the funds were deposited in WMP's Rhode Island Hospital Trust account on December 31, 1993. (Ex. 14, 15.) This was a loan

payment.

10. Based on the totality of the facts and circumstances in this case, the credibility of the witnesses, the apparent intent of the parties, and the timing and manner in which the transactions in Paragraph 9 occurred, I find that Thunberg has made capital contributions in the amount of $61,639,[1] and loan payments of $62,951. According to the formula agreed upon by the parties in Paragraph 5 of the Partnership Agreement (Ex. 2), Thunberg's partnership interest in WMP is 20.5%.

**Attempts to Terminate the Partnership**

11. On June 5, 1995, WMB notified Thunberg that his partnership interest had reverted to 0% because of his alleged failure to make the required $25,000 minimum capital contribution. (WMB's Mem. ¶ 23.)

12. Soon thereafter, Thunberg and WMB entered into the "Fourth Amendment to Partnership Agreement," extending until May 31,

---

[1] WMB argues that none of the payments made by Thunberg should be considered capital contributions. Since WMB kept the books and records of WMP, any labels unilaterally ascribed to these payments by WMB or its accountant clearly are not conclusive, are accorded little weight in the circumstances of this case, and in fact constitute, in hindsight, only WMB's preference. Most importantly, there is no evidence as to how or by what criteria Thunberg's payments were determined by WMB to be loan payments, versus capital contributions.

1996, the time for Thunberg to make the necessary $25,000 capital contribution. (Ex. 6.)

13. The June 5, 1995, purported termination was negated by the Fourth Amendment to the Agreement, and is otherwise a nullity in light of my finding (¶ 10) that Thunberg made capital contributions of $61,639.

14. On February 13, 1997, WMB again tried to end the partnership, this time by a certified letter from WMB's attorney, Andrew Sholes, Esq., ("February 13 letter") who reviewed the history and prior dealings of the parties, and concluded that the partnership was terminated. (Ex. 8.)

15. A document dated February 18, 1997, authored on behalf of WMB and entitled "Wakefield Mill Properties Certificate of Partner," also concluded that the partnership assets had been transferred to WMB, (Ex. 9 ¶ 9), but for the reasons discussed *infra* at 12, both the termination and the transfer of partnership assets to WMB were invalid.

16. Simultaneously, WMB's treasurer, Roy Dubbs, assigned the Thunberg note from Wakefield Mill Properties to WMB. (Ex. 10.)

17. When Dubbs informed Thunberg that his partnership interest had lapsed, (Ex. 10), he also offered Thunberg the position of

property manager, and stated that Thunberg would continue to receive a management fee of 6% of the building rents if he accepted the job offer. (Ex. 8.)

18. Thunberg never formally accepted the "property manager" offer, but the parties continued to deal with each other as they had in the past, with Thunberg managing the Mill Property, collecting and remitting rent money to WMB, attending to tenant issues, and doing whatever property managers do. Thunberg also continued his efforts to sell the Mill building to Atlantek, and did procure the eventual buyer in September 1997, many months after the alleged February 1997 termination. (Ex. EE and Debtor's testimony.)

19. On March 28, 1997, WMB filed with the Rhode Island Secretary of State, a Fictitious Business Name Statement registering "Wakefield Mill Properties" as WMB's new name. (Ex. 13.)

20. This second attempt by WMB to terminate the partnership, via the "February 13 letter," is also invalid because: (1) Thunberg did make his minimum capital contribution, thereby retaining his partnership interest; (2) WMB's attempt to terminate and liquidate the partnership was not done in accordance with the terms of the Agreement, (See Ex. 2 ¶ 14); and (3) even after this attempted but flawed termination, the

relationship and conduct of the parties remained virtually unchanged from what it was prior to the "February 13 letter," i.e., WMB continued to treat Thunberg as a partner,[2] it never revoked his authority to manage the partnership property, WMB continued to compensate him for management services, and by its conduct in general WMB effectively waived and disclaimed any alleged defaults by Thunberg, including any attempted prior terminations of the partnership.

**The Loan Account and the Promissory Note**

21. In June 1995, Thunberg executed a promissory note acknowledging that the balance of his partnership loan was $253,776.03. (Ex. 1; Debtor's Proposed Findings of Fact ¶ 32.)

22. In its proof of claim and supporting documents, WMB asserts that as of the date of the petition, it was owed: (a) principal and interest on the note in the amount of $378,828; and (b) $38,955 for diverted rents, for a total of $417,783. (Ex. 1.) The claim for diverted rents consists of the

[2] In a fax to Thunberg dated April 1, 1997, John Conforti stated that if the sale of the Mill building and the Farmer Brown property left cash exceeding his loan obligations, "We are prepared to make cash payments to you." (Ex. CC). This clearly suggests an acknowledgment by WMB that Thunberg was still a partner after the "termination" a few months earlier, and that WMB was prepared to make partnership distributions to Thunberg.

principal and interest due on money Thunberg transferred from the Newport Federal Bank, a partnership account, to his personal account in partial payment of a claimed finder's fee for the sale of the Partnership's Mill Building to Atlantek.

23. Thunberg was not forced or compelled in any way to sign either the Fourth Amendment to the Agreement or the June 1995 note, no duress was exercised by the Partnership, and both documents were executed voluntarily by Thunberg. (Debtor's Proposed Findings of Fact ¶ 33.)

24. Thunberg's debt to WMB, based on the June 1995 promissory note, is a partnership asset.

## CONCLUSIONS OF LAW

**The Atlantek Sale Commission**

The Agreement provides that "any partner who procures a ready, willing and able buyer for the partnership property shall receive six (6%) percent of the sale price as compensation." (Ex. 2 ¶ 9A.) WMB now contends that the payment of a commission to Thunberg would violate state law because *only* licensed brokers may receive commissions on the sale of real estate.[3]

---

[3] This argument, which is without merit for the reasons discussed below is also quite disingenuous, given the plain, unambiguous language of the Agreement, coupled with the long standing pattern of conduct between these parties.

Rhode Island Gen. Laws § 5-20.5-21 prohibits "an action in any court of this state for the recovery of a commission, fee, or compensation for any act done, the doing of which is prohibited under this chapter to other than licensed brokers." In considering a similar issue, the Rhode Island Supreme Court has distinguished finders from brokers, saying that a finder simply "set[s] the wheels in motion" such that the "finder finds, introduces, and brings the parties to a transaction together." *Bottomley v. Coffin*, 399 A.2d 485, 488 (R.I. 1979).

This is exactly what Thunberg did, i.e., he identified Atlantek as a prospective purchaser of the Mill Building, and over an extended period of time he ultimately persuaded Atlantek to purchase the property.[4] The language in the Agreement that "*any* partner who procures a ready, willing, and able buyer" may be compensated, is clear that a finder need not broker the sale, and that the compensation is earned when the partner finds the buyer of the property.

Under the Agreement, and as amply supported by credible evidence and controlling Rhode Island case law, Thunberg qualifies for the compensation agreed to by the parties, and he is entitled

[4] It is not alleged, nor is there evidence to support an argument that Thunberg's services did not produce the sale to Atlantek.

to compensation of $75,000, which is 6% of the $1,250,000 purchase price for the Mill Building. (Ex. 2 ¶ 9A.)

**Thunberg's Partnership Interest**

Based upon the entire record, I find and conclude that the Trustee has not established Thunberg's claimed 49% stake in WMP. Under Paragraph 5 of the Agreement, Thunberg's interest is based upon the total amount of his capital contributions. Based on my earlier findings that Thunberg paid approximately $124,000 to WMP, and that $61,639 of that amount should be allocated to capital contributions, Thunberg's interest in WMP is *at least* 20.5%. To make findings and conclusions beyond this point, however, the Court has problems, because neither party presented evidence sufficient to determine how the other ($62,951) payment(s) by Thunberg should be treated. The fact that WMP classified the majority of the transactions on its books as loan payments clearly does not carry the day for WMP. On the other hand, the allocation of payments also has a direct bearing on what is due on Thunberg's loan balance, i.e., if certain of the payments are treated as capital contributions, they cannot be credited to his loan account. It is also unclear whether WMP gave Thunberg credit (either on the loan or towards capital) for *all* of the payments listed in Paragraph 9 above. Based upon the present state of the record, it is not

possible to determine with reasonable certainty: (1) the balance due on the WMB loan; and (2) the value of WMP, as of today.

For dissolution purposes, the Court is disadvantaged by the absence of evidence as to the value of WMP's assets, its profits, and its liabilities. Therefore, in order to finish the job and effectuate a proper dissolution of the Partnership, I am ORDERING the appointment of an independent auditor to examine, determine, and report as follows: (1) the balance of the partnership loan to Thunberg, after allowing credit for all payments not determined to be capital contributions, and allowing credit for a full offset of the $75,000 finder's fee;[5] (2) the value of WMP, considering the profits and/or income of WMB after the failed attempts at termination, the value of the partnership assets at the time of the termination which are partnership property today, and the liabilities of the partnership, including those incurred or assumed by WMB after the attempted terminations.

The parties have until May 31, 2006, to agree upon the independent auditor, who shall be hired by the Trustee per Order of

---

[5] WMB charged Thunberg's loan account $38,955 for "diverted rents" which Thunberg actually took in partial payment of the finder's fee. Therefore the credit to the loan account should be $75,000 -$38,955= $36,045. Additionally, because the $38,955 should not have been classified as a loan by WMB, any interest charged on this sum to Thunberg's loan account should also be credited.

this Court. The reasonable fees and expenses for the auditor's services shall be borne equally by the Debtor's estate and WMB. If the parties are unable to agree on an auditor, the Court will make the selection, and the appointment. The parties are ORDERED to give the auditor their full cooperation and unfettered access to all pertinent information, books, and records requested. A status conference is scheduled for June 28, 2006, at 10:00 A.M., to hear a preliminary report by the auditor. Any party may request an earlier hearing/conference if necessary.

Dated at Providence, Rhode Island, this 16th day of May, 2006.

Arthur N. Votolato
U.S. Bankruptcy Judge

Entered on docket: 5/16/2006