UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| In re: BRUCE E. THUNBERG, Debtor-Appellee | : | C.A. No. 06-265S |
| WAKEFIELD MILL BUILDING, INC., Defendant-Appellant | : | Chapter 7<br>Bankruptcy Case No. 00-12818 |
| v. | : | A.P. No. 02-1046 |
| MARC D. WALLICK, Trustee, Plaintiff-Appellee, | : | |

**APPELLANT WAKEFIELD MILL BUILDING, INC.'S EMERGENCY MOTION FOR A STAY OF THE BANKRUPTCY COURT'S ORDER APPOINTING AN INDEPENDENT AUDITOR PENDING APPEAL**

Now comes Appellant Wakefield Mill Building, Inc. ("WMB") and brings this Emergency Motion for a stay of the Bankruptcy Court's Order appointing an auditor of WMB's books pending its appeal of the Bankruptcy Court's Findings of Fact, Conclusions of Law and Order Appointing Independent Auditor dated May 16, 2006. As grounds for its Motion, WMB relies upon the Memorandum of Law filed herewith.

WAKEFIELD MILL BUILDINGS, INC.

By Its Attorneys,

Charles S. Beal (#5559)
CAMERON & MITTLEMAN LLP
56 Exchange Terrace
Providence, Rhode Island 02903
Tel. (401) 331-5700
Fax (401) 331-5787

Date: July 27, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of July, 2006, a true copy of the within was sent, via first-class mail, postage prepaid, to: Stephen R. Famiglietti, Esq., FAMIGLIETTI & CARLIN LTD., 132 Old River Road, Suite 205, Lincoln, RI 02865; Robert D. Goldberg, Esq., Goldberg Law Offices, 226 Cottage Street, P.O. Box 557, Pawtucket, RI 02862-0557; Lisa Geremia, Esq., Geremia & DeMarco Ltd., 1350 Division Road, Warwick, RI 02893; and Andrew Richardson, Esq., Boyajian, Harrington & Richardson, 182 Waterman Street, Providence, RI 02906.

G:\CSB\OCEANSTATE\THUNBERG USBC\PLDGS 02-1046\MOSTAY2.DOC

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| In re: BRUCE E. THUNBERG, Debtor-Appellee | : | C.A. No. 06-265S |
| WAKEFIELD MILL BUILDING, INC., Defendant-Appellant | : | Chapter 7<br>Bankruptcy Case No. 00-12818 |
| v. | : | A.P. No. 02-1046 |
| MARC D. WALLICK, Trustee, Plaintiff-Appellee, | : | |

**MEMORANDUM OF LAW IN SUPPORT OF WAKEFIELD MILL BUILDING, INC.'S EMERGENCY MOTION FOR A STAY PENDING APPEAL OF THE COURT'S ORDER APPOINTING INDEPENDENT AUDITOR**

Appellant Wakefield Mill Building, Inc. ("WMB") respectfully submits this Memorandum of Law in support of its Emergency Motion for a Stay of the Bankruptcy Court's Order Appointing an Independent Auditor of WMB's books and records pending its appeal of the Bankruptcy Court's Findings of Fact, Conclusions of Law and Order Appointing Independent Auditor dated May 16, 2006 (the "Opinion and Order").[1]

**Preliminary Statement**

WMB -- by far the largest creditor in the pending bankruptcy -- appealed to this Court from an Opinion and Order entered by the Bankruptcy Court which it contends was clearly erroneous and contradicted by the undisputed testimony and documentary evidence. More specifically, WMB disputes the Court's specific findings, among others, that Mr. Thunberg made any "capital contributions" to a partnership called Wakefield Mill Properties (the "Partnership") entitling him to an equity interest in the Partnership. The basis for WMB's appeal is that each

[1] A copy of the Bankruptcy Court's Opinion and Order is annexed hereto for the Court's reference as Exhibit A.

and every one of the payments found by the Bankruptcy Court to be "capital contributions" were repayments of hundreds of thousands of dollars of loans that he took from the partnership (many without authorization) and were "booked" as such by Mr. Thunberg himself, who was then in control of the Partnership's books. Indeed, even Mr. Thunberg himself did not go so far as to claim that these loan repayments were "capital contributions," but instead only contended at trial that these payments "could have been" treated that way, while admitting on numerous occasions in writing that no capital contributions had been made.

Although the trial court's factual findings are entitled to great deference, the Bankruptcy Court's findings as to these capital contributions are, inexplicably, wholly unsupported by the record, and, remarkably, the Court did not make any effort to describe why it treated certain (factually indistinguishable) payments as "capital contributions" and it treated certain other payments as loan repayments.

WMB brings this emergency motion to stay the portion of the Court's Order that appoints an auditor to determine what share of alleged "profits" the Trustee would be entitled to as a result of the interest that Mr. Thunberg had in the Partnership. As explained more fully below, WMB asserts that the appointment of an auditor before this appeal is disposed of would have the effect of rendering the appeal moot. WMB therefore asks for a stay of the appointment of an auditor for the reasonably short period of time that it will take for the appeal to be heard and disposed of.

## Factual Background

This matter was tried in February of 2005. The two matters that were tried were WMB's Proof of Claim relating to a Promissory Note signed by the Debtor in the amount of approximately $400,000.00, with interest, and the Trustee's claim, asserted on behalf of the

Debtor, to alleged partnership profits relating to a partnership that had existed between WMB and Mr. Thunberg. The Court issued its Opinion and Order on May 16, 2006.[2] The following summary of facts relating to the dispute is relevant to the instant Motion.

A. The Partnership Venture

The testimony and evidence introduced at trial revealed the following:

During the late 1980's, the Debtor, Mr. Thunberg was employed as a General Manager for a sportswear manufacturer named Rugged Ware, in which his ex-wife was also a principal. The company apparently had hit hard times and was placed in a State Court Receivership. The company was located at a mill complex in Wakefield, Rhode Island, which it owned. As a result of the Receivership, the mortgage-holder on the mill property (Fleet Bank) took steps in 1991 to foreclose on its Mortgage, upon which approximately $1.2 million remained owing. (Thunberg testimony; Perlman testimony).

At that time, Mr. Thunberg's accountant suggested to him that Marc Perlman, one of his other clients and a shareholder in a successful chain of retail stores, might be interested in becoming involved with the project and preventing the foreclosure from going forward. Mr. Thunberg and Mr. Perlman were already acquainted, as they had played poker socially, and their wives were on friendly terms. (Thunberg testimony).

As a result of discussions, it was agreed that a partnership would be formed, whereby Mr. Perlman's entities would lend the Partnership the approximately $1.2 million to pay off Fleet Bank and prevent the foreclosure from going forward, and the mill property would be conveyed to the Partnership. The Partnership would be called "Wakefield Mill Properties," and the partners would be Mr. Thunberg, who would serve as General Partner, and WMB (a corporation

[2] A copy of the Bankruptcy Court's Opinion and Order is annexed hereto as Exhibit A.

in which Marc Perlman, Alan Perlman (Marc's brother) and Roy Dubs were the shareholders), would be the only other partner. Initially, WMB would be a 51% partner, and Mr. Thunberg would be a 49% partner, with an opportunity to acquire an equal 50% Partnership interest.

Pursuant to the written Partnership Agreement (the "Agreement"), Mr. Thunberg was required to make certain minimum capital contributions to the Partnership within eighteen months of June 13, 1991 in order to maintain his equity interest in the Partnership. Specifically, the Partnership Agreement provided in Paragraph 5 that:

> 5. FINAL CAPITAL CONTRIBUTION OF PARTNERS: The following persons and entity shall be partners and shall ultimately contribute to the capital of the partnership ***the cash amounts*** set opposite their names and shall be considered as having the following percentage of ownership:

| Partner: | Contribution: | Partnership Interest: |
|---|---|---|
| Bruce E. Thunberg | $150,000.00 | 50% |
| Wakefield Mill Building Inc. | $400,000.00 | 50% |

> Upon the signing of this Agreement, WMBI will contribute as its initial capital contribution, the same amount of capital as contributed by BET and will own fifty-one (51%) percent of the partnership interest. During the eighteen (18) months following the signing of this Agreement, WMBI will match BET's contribution dollar for dollar up to the sum of One Hundred Fifty Thousand ($150,000.00) Dollars. Thereafter, WMBI will contribute an additional Two Hundred Fifty Thousand ($250,000.00) Dollars within thirty (30) days from the date that BET shall have completed payment of his One Hundred Fifty Thousand ($150,000.00) Dollar capital contribution and at that point, and only after BET shall have completed payment of his One Hundred Fifty Thousand ($150,000.00) Dollar capital contribution, shall the WMBI partnership interest be reduced from fifty-one (51%) percent to fifty (50%) percent. If WMBI fails to contribute the additional Two Hundred Fifty Thousand ($250,000.00) Dollars within thirty (30) days of the date it is required to as set forth above, then it shall be given an additional thirty (30) days to make the contribution, otherwise, WMBI's partnership interest shall be reduced proportionately to the total contribution with the sum of Four Hundred Thousand ($400,000.00) Dollars representing a fifty (50%) percent interest in the partnership.

> Upon the signing of this Agreement, BET shall own a forty-nine (49%) percent interest in the partnership ***and shall continue to own a forty-nine (49%) percent interest in the partnership provided that he makes an initial capital contribution of Fifty Thousand ($50,000.00) Dollars to the partnership within the first six (6) months from the date of signing of this Agreement.*** If BET makes his initial contribution of Fifty Thousand ($50,000.00) Dollars no later than six (6) months from the signing of this Agreement, then the remaining One Hundred Thousand ($100,000.00) Dollars of BET's capital contribution shall be due and payable to the partnership no later than eighteen (18) months from the signing of this Agreement. Upon the completion of his One Hundred Fifty Thousand ($150,000.00) capital contribution then and only then shall he receive an additional one (1%) percent ownership interest and thus totally own fifty (50%) percent of the partnership interest.
>
> However, in the event, BET, shall fail to make his initial capital contribution of Fifty Thousand ($50,000.00) dollars within the six (6) months after the signing of this Agreement, then his partnership interest shall drop proportionately to the amount of his contribution with the formula of Seventy-five Thousand ($75,000.00) dollars being equivalent to 25% ownership of the partnership interest. However, notwithstanding the above provision, BET may be allowed to increase his partnership interest to fifty (50%) percent provided he pays the balance of his One Hundred Fifty Thousand ($150,000.00) Dollar capital contribution within one (1) year from the date of the signing of this Agreement.
>
> If BET fails to make his complete capital contribution of One Hundred Fifty Thousand ($150,000.00) Dollars by the end of this eighteen (18) month period, then he shall forever lose any and all right to acquire fifty (50%) percent ownership interest in the partnership and his partnership interest shall be based on the formula set forth above, namely, Seventy-five Thousand ($75,000.00) Dollars shall equal twenty-five (25%) percent of the partnership interest. ***If BET fails to make a minimum contribution of Twenty-five Thousand ($25,000.00) Dollars within the above eighteen (18) month period, then BET's partnership shall be reduced to zero (0%) percent but BET shall still keep his share of the capital account and receive his funds within thirty (30) days following the eighteen (18) month period.***

(Emphasis added). Accordingly, Mr. Thunberg was required by the Partnership Agreement to contribute at least $25,000.00 in cash to the Partnership within eighteen months, or his Partnership interest would revert to 0%.

The Agreement further provided that in addition to his Partnership interest, Debtor would be compensated for his labors by way of a "management fee" that would allow him to be paid 6% of any rents collected.

The Agreement further provided that it only could be amended or changed "in a written document signed by all of the parties." Mr. Thunberg was represented by counsel in connection with the closing on the Partnership Agreement. (Thunberg testimony).

Debtor, who in the early days of the Partnership was its "Managing Partner," acknowledged at trial that during its early years, a large number of his own personal debts were paid out of Partnership assets, including, among others, legal fees relating to his personal divorce proceeding, personal loans from banks relating to Vermont real estate owned by him, personal guaranties relating to the previous business in receivership, and other loans and advances of funds. (Thunberg testimony). As a result, Debtor and WMB began keeping track of a personal "loan account" of monies owed to the Partnership by Mr. Thunberg.[3] These monies were separate and apart from the management fees that he was being paid by the Partnership. (*Id.*).

In 1995, the Partnership, through its counsel, requested that Mr. Thunberg sign a promissory note in the amount evidenced by his loan account, or approximately $253,000.00. Although Mr. Thunberg initially protested, he signed the promissory note shortly thereafter. WMB filed a Proof of Claim in the Bankruptcy proceeding for that amount with interest, exceeding $400,000.00.

---

[3] The Bankruptcy Court inexplicably held in its Findings that WMB had control of the books and maintained the loan account. This finding contradicted the specific testimony of all of the witnesses that during this time period, Mr. Thunberg, as the "Managing Partner," maintained control of the books and records of the partnership.

B. Amendments to the Agreement

Throughout the first several years of the Partnership, the parties executed several amendments to the Agreement. Among other things, several of these Amendments extended Mr. Thunberg's time to make his capital contribution, the last extending until May 31, 1996.[4]

For example, on December 10, 1993, the parties entered into the "Third Amendment to Partnership Agreement," which stated:

> WHEREAS, Paragraph 5 of the Partnership Agreement contained certain capital contribution requirements of the partners and set forth certain dates by which the various partners were required to make certain minimum capital contributions; and
>
> WHEREAS, the parties now wish to extend the deadline for making these certain minimum capital contributions, the parties hereby agree as follows:
>
> 1. Each of the partners agree that the time in which Bruce E. Thunberg should make his minimum capital contribution payment to the Partnership as set forth in Paragraph 5 of the Agreement is extended up to and including December 15, 1994.

The Amendment, signed by Mr. Thunberg, specifically states that he had not yet made his "minimum" capital contribution as of that date. However, the Trial Court's Opinion and Order found, without explanation, that Mr. Thunberg *had* made his "minimum" capital contribution as of that date.

Similarly, the "Fourth Amendment" to the Partnership Agreement, which was the very last extension of time for Mr. Thunberg to make his capital contribution, provided as follows:

> Each of the partners agree that the time in which Thunberg should make his minimum capital contribution payment to the Partnership as set forth in Paragraph 5 of the Agreement is extended up to and including May 31, 1996; provided however, that prior to Thunberg completing his capital contribution and receiving an additional one (1%) ownership interest during the extension period,

---

[4] True and accurate copies of the amendments, which were introduced into evidence at trial, are annexed hereto as Exhibit B.

> Thunberg shall have repaid to Wakefield Mill Properties the outstanding amount of any advances and loans which he has received from Wakefield Mill Properties, together with accrued interest thereon, and that the Mortgage Deed to Republic Factors Corporation recorded on October 5, 1992 in Land Evidence Records Book 476 at Page 102 shall have been fully discharged.

At trial, Mr. Thunberg did not contend that all loan amounts had been paid off or that the referenced mortgage had been discharged. Despite these clear written acknowledgements by Mr. Thunberg that he had not yet made his minimum capital contribution as of that date, the Trial Court inexplicably found that he had made certain capital contributions, but, remarkably, did not state the basis of its findings. Also, the Trial Court incorrectly found that Mr. Thunberg continued to make capital contributions into 1999 -- ***some three years after the undisputed evidence showed that the last extension of time for Mr. Thunberg to make his capital contributions had expired.*** Tellingly, neither Mr. Thunberg nor the Trustee have ever contended that Mr. Thunberg's deadline to make capital contributions extended beyond May 31, 1996. Accordingly, the Bankruptcy Court's finding is clearly wrong.

The Bankruptcy Court further held that the Promissory Note corresponding to his existing loans from the Partnership was not signed under duress and that Mr. Thunberg remained obligated under the Promissory Note.

On May 25, 2006, WMB filed a Notice of Appeal of the Opinion and Order. The grounds for such appeal include, but are not limited to, the following: the Court's findings that certain loan repayments to the partnership were "capital contributions" represent an abuse of discretion and are unsupported by the record because, among other things:

- Mr. Thunberg was responsible for keeping the books of the Partnership during the relevant time period, and he booked the payments in question as loan repayments and not capital contributions;

- The Partnership's accountant, Steven Lima, testified that he was instructed by Mr. Thunberg to treat the payments as loan repayments, and *not as capital contributions*;

- Mr. Thunberg himself testified at trial that the payments in question were not considered to be capital contributions, but only contended that they "could have" been treated as capital contributions;

- Mr. Thunberg entered into numerous amendments to the Partnership Agreement after the date the payments in question had been made, in which he agreed in writing that he had not yet made his "minimum" ($25,000.00) capital contribution;

- Mr. Thunberg agreed in writing that *all* of his loans would be repaid before *any* capital contribution could be made; the Court made a factual finding that the loan had, in fact, *not* been repaid, so all of the payments were properly loan repayments;

- The Court found that certain substantial loan repayments were "capital contributions" even though they were made at least three years after the written deadline for such payments to be made; and

- The Trial Court did not state the basis for its conclusion that certain payments were considered by it to be "capital contributions" when other factually indistinguishable payments were found to be loan repayments.

Yet another ground for WMB's appeal will be that the Court remarked extensively in its Opinion and Order about damage evidence that was *not* presented at trial.[5] It is well-established under applicable law that the burden of proof -- both as to the Trustee's claim against WMB and the Debtor's Objection to WMB's Proof of Claim -- rested squarely on the Trustee and Debtor. Accordingly, the lack of damage evidence presented by them at trial was fatal to their claims, and the Court therefore erred by not requiring them to prove their claim/objection.

---

[5] Indeed, this sentiment was reiterated by the Bankruptcy Court at the hearing on a similar motion for stay when the Court repeatedly remarked on a "failure of proof" at trial as to damages allegedly suffered by the Debtor.

WMB respectfully submits that its meritorious appeal may be rendered moot if an auditor determines the respective liabilities of the parties, which would cause it irreparable harm, as described in greater detail below. WMB has already made this Motion, as required by the applicable rules, before the Bankruptcy Court, which denied the motion, but expressed its opinion on the record that this Motion might more appropriately be addressed by the Court deciding the appeal.

## Argument

### I. The Applicable Standard

The standard applicable to a motion for a stay pending appeal is similar to that which must be met for the issuance of a preliminary injunction. The movant must demonstrate (1) that there is a likelihood of success on the merits of the appeal; (2) the moving party will suffer irreparable harm if a stay is not granted; (3) the harm to the moving party if the stay is not granted is greater than the injury to the opposing party if the stay is granted; and (4) the public interest would not be adversely affected by the issuance of the stay. *In re: Miraj and Sons, Inc.*, 201 B.R. 23 (Bkcy. D. Ma. 1996). Because WMB satisfies each of these criteria, this Court should grant WMB's Motion for Stay of its Order pending appeal.

#### *a. WMB Has a Strong Likelihood of Success on Appeal*

i. The Bankruptcy Court's Findings Are Clearly Erroneous

As described above, the testimony relating to the specific payments found by the Trial Court to be "capital contributions" did not differ in any substantial way from the testimony relating to those found to be loan repayments. Indeed, Mr. Thunberg, who was in charge of the Partnership's books at that time, testified that he booked those payments as loan repayment in the books of the Partnership. Similarly, the Partnership's accountant testified that he was instructed

by Mr. Thunberg to book those payments as loan payments and not as capital contributions. In light of this clear and unambiguous testimony, the Court erred in finding that the payments in question were "capital contributions."

Not only did the testimony contradict the Trial Court's findings, but the documentary evidence demonstrates that the Trial Court's finding that the payments in question were "capital contributions" was clearly erroneous. Mr. Thunberg signed several amendments to the Partnership Agreement after the dates of those allowed payments, specifically agreeing in writing that he had *not* made his minimum capital contribution of $25,000.00. Further, the Trial Court specifically found that Mr. Thunberg further agreed in writing that he must repay his loan *in full* and have a specific mortgage discharged before making any capital contribution. The Court further specifically found that Mr. Thunberg *did not* pay his loan. Accordingly, the Court's ruling is clearly erroneous.

ii. The Court's Opinion and Order Is a Final and Appealable Order

The Trustee has asserted that the Bankruptcy Court's Opinion and Order is not sufficiently "final" so as to be appealable at this time. It is well established, however, that finality, for the purpose of appeal, is viewed more flexibly in the bankruptcy context than it is in other civil litigation contexts. *Newport Creamery v. Andrew C. Richardson*, 295 B.R. 408, 415 (B.A.P. 1st Cir. 2003) (citing *American Colonial Broadcasting Corp.*, 758 F.2d 794, 801). The standard for finality is more flexible because bankruptcy proceedings often continue for long periods of time and discrete claims are resolved from time to time over the course of the bankruptcy proceedings. *In re: XO Communications, Inc.*, 330 B.R. 394 (2005).

Proceeding under that logic, the First Circuit has held that a bankruptcy order need not dispose of all aspects of a case in order to be final; an order which disposes of a discrete dispute within the larger case will be considered final and appealable. *Newport Creamery*, 295 B.R. at 415 (citing *In re Saco Local Dev. Corp.*, 711 F.2d 441, 444 (1st Cir. 1983). *See also, Angel P. San Miguel Sandoval*, 327 B.R. 493, 505 (B.A.P. 1st Cir. 2005) (stating that a bankruptcy court order may be appealable if it conclusively determines a discrete dispute within the larger case). Likewise, the Ninth Circuit has summarized a test for determining whether or not a bankruptcy order is appealable. It is appealable when it: 1) resolves and seriously affects substantive rights; and 2) finally determines the discrete issue to which it is addressed. *In re: NSB Film Corporation v. Credit Lyonnais Bank Nederland*, 167 B.R. 176 (B.A.P. 9th Cir. 1994). *See also, In re: General Carriers Corporation*, 258 B.R. 181, 186 (B.A.P. 9th Cir. 2001) (stating that a bankruptcy court order is final and appealable when it: 1) resolves and seriously affects substantive rights; and 2) finally determines the discrete issue to which it is addressed).

Here, the Bankruptcy Court's Opinion and Order determined that the Debtor was a partner in the Partnership by way of certain capital contributions made by him. In the absence of a finding of such capital contributions, Mr. Thunberg would have no partnership interest and no claim to alleged profits. Further, Judge Votolato held that Mr. Thunberg was entitled to a "finder's fee" on a sale of real property that the Partnership was improperly dissolved -- each of which finding on these discrete issues is a part of the instant appeal. As these issues have been finally determined, they are now properly appealable.

***b. WMB Will Suffer Irreparable Harm In the Absence of a Stay***

The relief that was ordered by the Judge -- namely, that an auditor be appointed at the parties' expense -- would have the practical effect of mooting WMB's appeal. The auditor's

work is likely to be completed and implemented before the relatively brief time that it will take this appeal to be disposed of.

Also, a forced audit requires WMB to share proprietary information that would not otherwise be available to Debtor. This, too, constitutes irreparable harm.

Further, while loss of money is not normally found to be irreparable harm, the non-reimbursable expenses associated with the audit is also irreparable harm, as there is no remedy at law to retrieve them. WMB will also be substantially harmed by the disruption that will be caused to his business as a result of an audit. Accordingly, this prong of the standard also favors entry of a stay.

*c. **The Harm to WMB If the Stay Is Not Granted Is Greater Than The Injury to The Trustee If the Stay is Granted.***

The harm to Debtor and the Trustee if the stay is granted -- namely, that they will have to wait a relatively short period of time for the appeal to be disposed of -- is far smaller than the harm that would befall WMB if the audit goes forward. The audit would not only have the effect of mooting the appeal, which would cause the imposition of additional non-reimbursable expense, but would also substantially disrupt the business of the principals of WMB. Accordingly, this factor too favors the imposition of a stay.

*d. **The Public Interest Would Not be Adversely Affected by the Issuance of the Stay.***

It is respectfully submitted that the imposition of a stay would have no affect on the public interest and that this prong of the test also favors imposition of a stay.

## Conclusion

For all of these reasons, WMB respectfully requests that this Honorable Court stay the portion of the Order appointing an auditor pending disposition of its appeal and granting such further relief as it deems just and appropriate.

WAKEFIELD MILL BUILDINGS, INC.

By Its Attorneys,

Charles S. Beal (#5559)
CAMERON & MITTLEMAN LLP
56 Exchange Terrace
Providence, Rhode Island 02903
Tel. (401) 331-5700
Fax (401) 331-5787

Date: July 27, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of July, 2006, a true copy of the within was sent, via first-class mail, postage prepaid, to: Stephen R. Famiglietti, Esq., FAMIGLIETTI & CARLIN LTD., 132 Old River Road, Suite 205, Lincoln, RI 02865; Robert D. Goldberg, Esq., Goldberg Law Offices, 226 Cottage Street, P.O. Box 557, Pawtucket, RI 02862-0557; Lisa Geremia, Esq., Geremia & DeMarco Ltd., 1350 Division Road, Warwick, RI 02893; and Andrew Richardson, Esq., Boyajian, Harrington & Richardson, 182 Waterman Street, Providence, RI 02906.

G:\CSB\OCEANSTATE\THUNBERG USBC\PLDGS 02-1046\MEMOMOSTAY2.DOC